I'm not sure both attorneys were here earlier, but I did want to advise both of you that Justice Robert Gordon is the third panel member on this appeal. He's not here today, not available, but he will be reading the briefs and listening to oral arguments and be the third justice on the case. So with that, would both attorneys that are going to argue, please step up and identify yourselves for the record. Yes, I'm Jennifer Bontrager from the State Appellate Defender for Oscar Flores. Ms. Bontrager. I'm sorry, Jessica Ball, Assistant State's Attorney on behalf of the people. All right, Ms. Ball. Each of you may have about 15 minutes for your presentation, and from that, Ms. Bontrager, you may save out some time for your bond. Thank you. All right. I'd like to save a few minutes. All right. Well, good morning, and may it please the Court. Your Honors, some extraordinary errors occurred during Oscar Flores' retrial. I plan on focusing on two of those today, time permitting, of course. First, the spectacle that was created when the State was allowed to ask leading questions to a mute witness, Robert Macias, who was Oscar's co-defendant. And second, the double and triple hearsay identifications, testimony, sorry, introduced through the testimony of Antonio Casillas and Detective Swideric. Robert Macias' trip to the witness stand was doomed from the start. He refused even to be sworn under oath as required by Illinois Rule of Evidence 603, so he was not even a competent witness. He remained silent. He refused to give his name. He refused to provide an introduction for himself. But the State – Ms. Bontrager, is it your position that the State was attempting to elicit their version of the facts through their questioning of Mr. Macias? Yes, certainly, Your Honor. So by doing so, was Mr. Macias ever asked about the specifics of the crime? He was asked whether he was convicted of first-degree murder and attempt first-degree murder in this case. He was asked whether he was arrested and taken to Area 3 in this case. He was asked whether when at Area 3 he was Mirandized and whether he made a statement in which he admitted to being the driver in the drive-by shooting of Victor Casillas and Leonel Medina. He was asked if he admitted to driving a stolen minivan. He was asked if he knew the defendant Oscar Flores. He was asked if he was a member of the Latin King Street gang. He was asked if he was – I'm sorry, if the 2-6 and the Latin King gangs were at war in 2007. He was asked if he met with the defense attorney and an investigator in the case. So it's your position that those questions in and of themselves prejudiced the defendant because they were getting their version of facts out without him responding at all? Absolutely, Your Honor. It also created the implication that Macias had something to hide or that the defense had something to hide because they objected to every single one of those questions. Is it automatic error for the state to call someone to the stand when they've been given use immunity? No, no. Isn't that kind of how this developed? The state asked to grant him use immunity. Correct. And the trial judge allowed it. Correct. And then he was called. Correct. He never said anything, correct? Correct. And wouldn't the state have to ask some of those questions in order to get a contempt charge against the witness, Mr. Macias? I think in this case, the state would have been able to get the contempt when he refused to even be sworn under oath to serve as a witness. But nothing more than – I mean, it's quite clear that he's not going to be answering questions. If any questions are permissible, it's, you know, could you give us your name? All right. Let's talk just a little bit about the questions. Asking him his name, how does that really show anything about the crime? I don't really take issue with him asking about his name. How about the next thing, then? Did you have a telephone conversation with the defense attorney? How does that in any way suggest he was involved in a crime with the defendant here? Well, if he's talking to defense counsel and an investigator, it sounds like he's certainly working with the defense. And if he's working with the defense, then there's something – it's something related to the case. Well, is that it? It has something to do with the case? Well, I mean – I'm just trying to compare this to the, you know, the case that you rely on. That's all. What about were you arrested and taken to Area 3? Right. Were you arrested and taken to Area 3? In June of 2017. 2007, I think. Oh, I'm sorry. That's a typo. Yeah. It doesn't matter. 2017. The year doesn't really matter. Yeah. I mean, how does that suggest that the defendant and he some way committed a crime together? Well, that question followed the earlier question of were you convicted of first-degree murder and attempt first-degree murder for this case? Okay. So then the next one sounds a bit like background. Well, were you arrested on such-and-such date and taken to Area 3? So that suggests he's arrested for that crime that he was convicted of. What were the questions, though, in the other case, then? In Ischierdo or in Evans? Evans is what you're relying on, isn't it? I'm relying on both Evans and Ischierdo. Evans is a longer opinion and has a lot more discussion in it. I think Ischierdo is one that is most similar here. There, even fewer questions were asked. In Ischierdo, the State called a witness to testify about a conversation that he had had with the defendant in jail. The witness answered preliminary questions, agreed to be a witness and answered some preliminary questions identifying himself. But then when he was asked to relate the contents of the purported conversation with the defendant, he exercised his right against self-incrimination. The witness then answered so that he was then asked two more leading incriminating questions. Not incriminating. He was asked two more leading questions about, you know, did you have a conversation, did you have a conversation about such and such with the defendant, so and so. He answered those by saying he was going to refuse to respond and then remained mute for the third question. And here we have seven questions being asked. The witness didn't even answer the neutral questions. So there were a few neutral questions? Asking his name. And the other difference between this case and those others is that here the court actually instructed the jury that they were to completely disregard the questions that were asked of this witness. That happened in Ischierdo, too, and it was still found to be reversible error. The court said that, you know, recognize that substantial prejudice does not vanish from the human mind simply because a judge says it should. Well, refresh my memory again, then. What were the questions that were asked in the case you just spoke of, Ischierdo? Ischierdo, I don't have the- Ischierdo. I can grab them really quickly. Sure. Go ahead. Ischierdo. So the individual was asked where he resided at a jail, how long had he been there. That question was also answered. Are there currently charges pending against you? You're scheduled to go to trial. Have any deals or offers been made to you for your testimony today? He says, no. Well, you know, I've been over there and you don't believe me. You know, you believe me when it suits your benefits. I would like to plead the fifth. Okay, have you had conversations with the defendant while a resident of the jail? I plead the fifth. Is there something incriminating about the conversations you may have had with the defendant incriminating yourself? Silence. The prosecutor then gives up. And there he actually said, I want to plead the fifth. He did. Here we have right before trial, Robert Macias' counsel said he will be, you know- But that was never said in front of the jury. Is that correct? That's correct. That wasn't said in front of the jury. They still think these cases are very similar. And reversible error occurred in both. And there was an instruction. There was an instruction given in Isquierdo. But the court found that that just wasn't enough, that this was a rather remarkable thing to have happened. And the jury, an instruction is just not enough to cure the impact of such a weird thing happening in front of them. Can we talk about the MySpace page? Sure, Your Honor. I'm sorry if I'm throwing you off. No, it's fine. I'm here for your questions, Your Honor. The first time this case came up on appeal, this court was very specific in saying that the captions on redrawal should not be allowed. Correct. Okay. So based on that, the captions on all of the photos except one were- Redacted. Thank you. Redacted. How is the one caption so prejudicial to you that it warrants a reversal? That caption, the exact quote for which I don't have in front of me, is highly prejudicial. It's Little Bones, which refers to Victor Casillas. Little Bones, Rots, the R-O-T-S-K, meaning Rots in Hell. Ha, ha, ha, one less Avers, which refers to- That one didn't come in. I think the one that came in this time was just Little Bone R-O-T-S-K, correct? I think the rest of the ha, ha, ha, I think that's all part of one caption. I believe that came in. Well, I guess the state takes serious issue with your claim that that photo with that caption ever came into the record. Does it make a difference? I think Little Bone Rots, R-O-T-S-K, is bad enough as it is. There's nothing that changes. I mean, it's an advertisement celebrating a death. Wasn't there a little sidebar, apparently, about using the photo with the caption that's off the record for some unknown reason? There is a sidebar. There is a record made possibly a little bit later in which there is a back and forth about why the judge lets the prosecution add the- And why did she? Based on the prosecution's argument that defense counsel had opened the door to it somehow by asking the detective about whether he investigated another tip about another individual. Right. Wasn't there a suggestion to the jury that he didn't really investigate this at all? Not that he didn't investigate it at all, simply that he tapered off in his investigation of the other tip that he had and focused on Oscar instead. Wasn't the court allowing some minimal discussion about the caption because it was permitting the state to explain what exactly the detective did? I don't think that is enough to allow in a caption that Your Honors previously held were highly prejudicial and should not have been admitted. Didn't the court, though, indicate its ruling was a curative admission? She might have said that. I don't recall her exact reasoning. Isn't that what we have to look at for an abuse of discretion, whether she abused her discretion? I mean, even if she allowed it in for curative purposes, it doesn't cure anything. The fact that there's a caption that Your Honors previously acknowledged, no one knows where it came from, no one knows who put it there. We didn't know if counsel would open the door to something later, did we? I mean, how would we be able to predict that? You wouldn't have, but I still don't see how asking about investigation of, you know, whether another tip was investigated opens the door to a- I said it did. I'm just saying that's what the trial judge used. Now, did the state ever really argue anything about this caption at any time in the closing? I believe they showed that photograph with its caption during closing argument. I don't- Did that go back to the jury? Sorry, Your Honor, I don't know. Okay, and you think that the jury saw the caption or something during closing argument and that they actually referenced the comments, the caption? I apologize, I don't recall if they mentioned the caption. I don't think there was really a caption. Was the ROTSK, I know it means rotten hell to a two-sex killer, right, ROTSK, was that explained to the jury? It was. Okay. Yes. And there was no objection to that testimony by that officer, was there? I believe there was. Finley? I don't know. The state says that that's forfeited because there was no objection at all. Well, the objection, the caption coming in at all was certainly objected to, which I think is enough for this Court to find it preserved. But I'm saying there was this other discussion about what it meant by some other officer named Finley. Okay. And that was not objected to at any time. At least that's what they say. I don't recall. I'm sorry. Okay. I'm well out of time, so thank you. Thank you. Ms. Ball? Good morning. Good morning. In this case, regarding calling Macias as a witness, the state properly did that. As Your Honors indicated, he had been granted use immunity. And where immunity is granted, the state has the right to demand and expect testimony from a witness, even under compulsion by the court. And following that up, they also have the right to ask those questions, which did not violate the Confrontation Clause. Is the difference between this and Escuedo, in Escuedo, the witness, repeatedly asserted the Fifth Amendment? And here we just are met with silence. Well, we have Isquerdo. He was not granted use immunity. And he did take the Fifth Amendment in front of the jury. Two things completely distinguishable from this case here. In this case, you have the – They said it beforehand. He basically didn't answer any questions. Isn't that taking the Fifth? No, it's not. In this case, the prosecutor said, as an officer of the court, that he did not know what Macias would say when he took the witness stand. Didn't the lawyer say before the questions and answers were asked that he was going to take the Fifth? The defense attorney said that, but the state's attorney had no conversation with him. And he had every right to expect that he could call and this witness would cooperate with the grant of immunity and not commit a crime. People also change their mind. They say they're going to take the Fifth, and when they take the stand and they're confronted with being held in contempt, they change their mind. Was it necessary to ask the extent of those questions in order to proceed on a contempt proceeding? It was necessary to ask the questions that they did in order to establish the relevance of this witness, and as you indicated, to determine the extent or the scope of the contempt charges. Are we really concerned, though, with that, or are we concerned with whether or not the right to cross-examination was violated? The right to cross-examination, there was no Confrontation Clause violation. No problem with that because the attorney, the prosecuting attorney, had the right to call and ask those questions. The questions that he asked were very preliminary. There were a set of preliminary questions, not prejudicial. There were four questions that the prosecutor asked regarding Macias' involvement with the crime, not the defendant's involvement with the crime. When he determined that those questions, those type of questions, wouldn't be answered, he asked just three questions about gangs, not the defendant's involvement in gangs, but Macias' involvement in gangs. And when he realized he wouldn't answer those questions, he stopped. That was the end of it. I'm going off here, but what was the actual sentence in this case on redraft? Was it consecutive terms? I apologize, Your Honor. Well, you say it was. I don't know. I'm just curious. I'd have to go back and learn, and I can check on it. Let's talk about the caption. Let's talk about the caption. Okay. So it comes up the first time. The first opinion is pretty clear. Do not introduce these captions. What happened that somehow putting that in front of the jury, the rotten hell two-sixer killer, is somehow not presciential to the defendant and doesn't violate this court's original ruling? We went out of our way to abide by this court's ruling. We redacted everything that this court said to redact. When we questioned the witnesses on direct examination, we never asked any questions related to those captions. We never pointed out the redactions at all to any of the witnesses. But then on cross-examination, the defense attorney's questions made it seem like there was a witch hunt against this particular defendant, made it seem like there was the same tip against Barajas and this defendant, but that the investigator just chose to pursue the defendant. And that wasn't true. Obviously, the police had more information against this defendant. And in those situations, is the state just supposed to sit back and allow the defense attorney to create an inference that both parties know is untrue? Well, let's talk about that information. Now, the defendant has argued that there was inadmissible hearsay that was introduced in two different forms in this case. One was through the brother of the victim, Antonio, right? Correct. And Antonio testified that another person told him that Little Rowdy was bragging about killing his brother. Okay. Their argument is that that was totally inadmissible hearsay. What is your response to that? It was admitted for course of investigation purposes. The state never relied on that. The course of investigation, are you saying it extends to third parties and citizens? The effect on the listener. This all involved – first of all, the state never used – Okay. So what is it? It's effect on the listener when Antonio is testifying about it and its course of investigation when the detectives testify about it. Okay. So it's separate. It's separate. The arguments are very similar, of course. And most importantly, the state never used that testimony to show that the defendant was in fact bragging about the murder. But it was in front of the jury. It was. The jury heard multiple times that Little Rowdy, who turns out to be the defendant, was bragging about killing Victor. Yes. So how can you say you didn't really use it when they heard it multiple times? Because our state's attorney in this case told the jury during closing argument exactly how to use it. And when I say that the state never used it to show that the defendant was actually bragging about the murder, it's because in closing argument our prosecutor said, how do we get here? They talked about Angel Rodriguez. Since when does the prosecutor instruct the jury on the law? In every case. In every case? No. Isn't the judge the one that instructs the jury? There's nothing that the lawyer says that amounts to evidence or instruction. It's just their version of what the evidence is, or the judge will tell you this. The state's attorneys typically do go over the law that applies to the case. Yeah. Were you ever instructed on this at all? Not from the judge, but what you have from – and that's because the defense – I guess you've answered my question. The assistant state's attorney doesn't instruct the jury on the law. The defense never asked for an instruction on this. That's true. But what the state does do during – the state, again, never used this substantively. They never mentioned it in an opening statement. They never argued it in closing argument. The first person that mentioned this was the defense in his closing argument, and then in rebuttal the state responded to that. And I think it is important. All right. Let's go back just briefly to this idea about statements when the course of the investigation is allowed. But just to the police officer, aren't there a number of cases that say that it's not appropriate to go into the content of the conversation, but just simply what the officer did after speaking to someone? Couldn't that have been done in this case? There's case law that says very clearly also that the content of the conversation is  And without that testimony in this case, Antonio's steps wouldn't have made sense, and the detective's testimony wouldn't have made sense. It would have appeared like it was some haphazard, illogical, irrational investigation. But in a lot of cases, isn't it simply done by saying, I spoke to Antonio, and then I retrieved a photograph of little Rowdy, who it turned out to be was Oscar Flores. In some cases, it is done that way. Why couldn't it have been done that way here? Because in this case, they needed that information to tie it all together. To just have Antonio go looking in a yearbook for no apparent reason, to just have Antonio going on MySpace with his cousin's account, that doesn't make any sense either. How does the detective get in possession of these MySpace photos? Didn't he do that with Barajas, that he had a tip that he was bragging to? That also came in, again, not for the truth of the matter asserted, but to show the course of the investigation. Why were these two individuals put in a lineup? So there was no objection to him testifying about Barajas, but the defendant did object as far as the defendant. Yes, those objections were made, but it was used for the same purpose. Well, it was prejudicial to the defendant. At least that was the argument. That's the argument. But again, the State, during closing argument, very clearly said, why do we have these pictures? And if I can, what he says is, in response to the defense argument, they talked about Angel Rodriguez and the rumors and all the things. The importance of that and that evidence is it shows how we get to MySpace, how we get to these photographs. Well, that's one thing. You can say, okay, the victim's photograph is on his MySpace page, is on the defendant's MySpace page. Why does the State have to go to the third rail of bringing in the captions? I'm not understanding that. This case has already been reversed based on that exact issue, and yet they do it again. Because the State has the duty to portray the truth, and the defense violated that. They asked questions that raised an inference that wasn't true. They raised the inference that the police had the same information, the same tip against both of those suspects and just chose to pursue the defendant. And that wasn't accurate. And a trial is a process. Did the court later say, was there a discussion then later on the record where the court said, I will permit this because. . . Yes, because the defense opened the door. The trial is a truth-seeking process, not a process for gamesmanship, for the defense attorney to create. . . And how would you review that judge's decision? It's for an abuse of discretion. All right, the highest standard of deferential review. Absolutely. All right. Let's talk about prosecutorial misconduct allegations in the closing argument. So we have, they were stalking for victims. The Latin King kill team sits at the table. The hunting theme goes on. He was on the hunt for victims. He hunted for his victims. They were working as a kill team. Your guilty verdict will tell this man no more shooting on the streets of our city. That comment was the only one that was sustained in objection to. Is that correct? That's correct. Okay. So tell me why all of those are A-okay. They're reasonable inferences based on the evidence. The evidence in this case clearly showed that Leonel, Leonardo, and Victor were all members of the 2-6, that the defendant was a member of the Latin Kings, that those two gangs were at war, that the defendant was in a stolen minivan in 2-6 territory, that the minivan stopped, that the defendant shot at Leonel, yelled King, and then peeled off, that the minivan continued driving within 2-6 territory, came upon two other 2-6 gang members and stopped again, that Victor flashed a gang sign to the defendant and disrespected the Latin Kings, and the defendant opened fire again. Absolutely, from that evidence, it's a fair inference that the defendant teamed up with another Latin King, drove through 2-6 territory, and was looking for rival gang members to kill. They never shot at the four women who were witnesses on the street. They absolutely targeted members of the 2-6. So those comments were all fair inferences based on the evidence in the case. Well, in addition to that, though, there was no objection to any of these except for one, which the court sustained the objection to. Correct. So we're reviewing that under a plain error analysis, aren't we? Yes. All right. Well, you've answered why you think that there was a reasonable inference. Are there any other questions or no other questions? All right. Thank you. Ms. Bontrager, what's your understanding of the sentence in this case? You don't really say in the brief. Was it space concerns rather? Concurrent, consecutive, what? As far as my notes say that I was just looking at, the judge did not mention concurrent or consecutive in her sentencing. She parsed out sentences for various counts. She made the firearm enhancement a separate count, but there's no indication whether she ran them concurrently or consecutively. At the actual sentencing hearing, was there a motion to reconsider immediately thereafter? There was. And isn't there a suggestion or a statement that the sentences were consecutive? I apologize. I didn't have that in my notes. All right. I was just curious. I don't know what the sentence actually is because you didn't really say, and then the state suggests in their brief it was consecutive or something. So that was what it was originally, wasn't it? That's true. Yes. Okay. I apologize. I don't have those details for you, Your Honor. All right. Now, the state went back to this, his codero, and said, in that case there was no grant of use immunity. Does that make a difference? I really don't think it does. Once Macias is remaining silent, the state does not get to, just because there's a grant of use immunity, the state doesn't get to introduce inadmissible things like the fact that the defendant, I'm sorry, that Macias was convicted of first-degree murder and first-degree murder for the same case. But wouldn't there almost be a presumption that there was error? Because in that case, in his codero, however you pronounce it, I apologize, in that case there was no grant of use immunity. So the prosecution should not have been asking those questions in the first instance. Isn't that the case? Isn't that the scenario that we envision where it may be error to simply start asking questions of this nature when there has been no grant of immunity? I mean, the court in Izquierdo, nevertheless, said that it was error to have called this witness knowing that he was not going to cooperate and to ask questions that attempted to introduce the state's theory of the case, that they tried to incriminate the defendant. They tried to compel testimony in violation of a Fifth Amendment privilege. The fact that there was use immunity grant doesn't change the fact that Macias remained silent. They don't get to ask leading questions. The court held in Evans that asking leading questions that, you know, suggests or imply the theory of a state's case and that that individual implicated the defendant himself in the crime that's at issue, that's improper and it's reversible error. How do you respond to the argument that in closing the evidence supported in inference that these two gang members went into opposing gang territory and one was driving and one was shooting and they shot at one young man first and then continued and then they shot at two other young men and those men all happened to be rival gang members? They all happened to be rival gang members. And the women, the young women or the girls, I'm not certain their ages, that none of them were the target of the shooting? I mean, I don't think we know exactly who the targets of the shooting were. How about the fact that one fellow was only 15 feet from him? I mean, how can you say there was no target? He actually took the gun and shot the person who was only a few feet from him. How do you say that's not a target? I mean, I'm simply saying that the state introduced zero evidence of motive. So calling it a kill team, it might have been a spur of the moment thing. How about the disrespecting? I mean, aren't there cases all over the courts that indicate that people get shot for doing just that very thing, showing disrespect from one gang member to another? I mean, it's senseless and it makes no sense, but isn't that, don't we read about that in cases that people get shot all the time because they're not in the same gang? Sure. So that actually is a motive. It's just that it's a very senseless and, you know, unfathomable motive for both or all of us to understand. Sure. I just don't think it's support. The state didn't introduce any specific motive in regards to this case other than, you know, a flash of a gang sign that doesn't support hunting and stalking for victims. It doesn't support the state in closing, in rebuttal closing argument, discussing their utterly fabricated idea that Gonzales had recanted his identification of Oscar out of fear, something that Gonzales himself specifically. Well, where is the word fear in the record? They suggest that Gonzales had to protect himself. No, they didn't say protect. That word's not in the record. The only use of the English language that I recall that's in this record is, you need to look out for yourself. That was one of the questions asked to him. But in closing arguments, the state even opened up with, you see what happened in this courtroom when Leonardo came out and faced this defendant is nothing unusual. It happens frequently, sadly. Circumstances change. When Leonardo came out and said he didn't remember, maybe willing to do the right thing when the blood was fresh, but he changed his mind about telling the truth and doing the right thing. Okay. There's no word fear or that someone threatens him or that he was going to be hurt in some way. I mean, I thought you acknowledged in your brief that there weren't any actual threats made or that, you know. Of course there weren't any threats made. That's why the state had no business fabricating this alternative explanation for why Gonzales would have recanted his identification. And I just wanted to make that point, too, is that that's all the state's case rests on, is a single recanted identification. Those four witnesses the state just mentioned, none of them identified Oscar. All of them gave descriptions. All of them said, yes, I would be able to identify the passenger, the shooter in that minivan. All of them or just some? Wasn't one of the two women or at least two of them say that they wouldn't be able to? No, they all said that they would be able to recognize. One woman said she absolutely would be able to recognize. None of them picked Oscar out of a photo array or a live lineup. So all of the improper evidence that came in in this case, the improper hearsay, the leading questions to Macias were filling huge gaps in the state's evidence in this case. If Your Honors have no other questions. Thank you. Thank you. The case was well argued by both sides and well briefed, and we will take it under advisement and the court stands adjourned. Thank you. Thank you.